# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CHELSEA ABOWD, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. |
| FAIRLIFE, LLC, MIKE McCLOSKEY, and SUE McCLOSKEY, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) ) ) | |

## ORIGINAL CLASS ACTION COMPLAINT

NOW COMES the Plaintiff, Chelsea Abowd ("hereinafter referred to as "Plaintiff"), on behalf of themselves and all others similarly situated, and brings this class action against the above-named Defendants ("hereinafter referred to as "Fairlife" or "Defendants") and respectfully show the Court as follows:

### Nature of the Action

1. Fairlife and its two co-founders, Mike and Sue McCloskey, charge a premium for their Milk Products by plastering their "promise" – in bold lettering signed by Mike and Sue

McCloskey, on the Products' labels – that Fairlife provides "Extraordinary care and comfort for our cows" and "provide[s] extraordinary animal care." They "promise" on the Products' labels that "exceptional care [is] taken every step of the way" and that, through selling their Milk Products, they are "making the world a better place." Right on the Products' labels, they urge customers to "visit our flagship farm in Indiana so you can see for yourself" the "[e]xtraordinary care and comfort" that their cows receive. But Fairlife's and its founders' "promise" is a sham. Their cows do not receive "extraordinary care and comfort." As a matter of routine and practice, Fairlife's cows are tortured, kicked, stomped on, body slammed, stabbed with steel rebar, thrown off the side of trucks, dragged through the dirt by their ears, and left to die unattended in over 100- degree heat. Calves that do not survive the torture are dumped in mass graves. To add insult to injury, the abuse is rampant even at Fairlife's "flagship farm in Indiana" that customers are urged to visit on the Products' labels.

2.   Plaintiff and the class members she seeks to represent purchased numerous bottles of Defendants' Milk Products based on Defendants' misleading and false advertising and labeling of the Milk Products. Plaintiff and each of the class members accordingly suffered an injury in fact caused by the false, fraudulent, unfair, deceptive, and/or misleading practices set forth herein.

3.   Plaintiff seeks relief in this action individually, and on behalf of all purchasers of Defendant's Milk Products, for Defendants' fraud, negligent misrepresentation, unjust enrichment, and violations of various state consumer protection laws discussed herein.

4.   Defendant Fairlife, LLC ("Fairlife") is a Delaware corporation headquartered in Chicago, Illinois. Fairlife manufactures, advertises, sells, and markets various milk products nationwide, including in Indiana. Fairlife's principal source of milk is its dairy plant at Fair Oaks Farms, located in Fair Oaks, Indiana. Fairlife is owned by Select Milk Producers Inc. and the Coca-Cola Company and is distributed by Coca-Cola Refreshments.

5. Defendants Mike McCloskey and Sue McCloskey, residents of Indiana, are the owners and operators of Fair Oaks Farms and are co-founders of Fairlife and of Select Milk Producers Inc. Ms. McCloskey developed the ultra-filtered process to remove the lactose from the milk to create what they brand as "ultra-filtered milk." The McCloskey's devised the fraudulent marketing scheme for Fairlife and are responsible for both the false representations and the animal abuse that occurs at Fair Oak Farms. Defendants Mike and Sue McCloskey act as spokespersons for Fairlife milk products and make a personal "promise," signed under their own names, on the product labels that are the core of the fraudulent marketing scheme, including the promise that Defendants provide "extraordinary care and comfort for [their] cows." Defendants Mike and Sue McCloskey have promoted the fraudulent marketing scheme on Fairlife's website and on Fairlife's social media platforms.

6. At all relevant times, each Defendant acted in concert with, with the knowledge and approval of, and/or as the agent of the other Defendants within the course and scope of the agency, regarding the acts and omissions alleged.

## Jurisdiction and Venue

7. This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. § 1332(d), Plaintiff's claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interest and costs, and there are numerous Class members who are citizens of states other than Defendants' states of citizenship.

8. This Court has personal jurisdiction over Defendants because Mike and Sue McCloskey are residents of the State of Indiana and Fairlife is registered to do business in and in fact conducts substantial business in the State of Indiana.

9. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## Background Facts

10. Meat and dairy manufacturers have begun making representations about animal welfare on product labels to propel more sales or to justify charging higher prices. The reasoning is simple: consumers deeply care whether their food comes from animals that were humanely treated and received a high level of care and are willing to pay a price premium for food sourced from humane farms. Defendants made claims that their animals receive "extraordinary care and comfort" and their "promise" that "exceptional care [is] taken every step of the way" for this reason – to charge inflated prices and increase unit sales of their milk products.

11. A common interpretation of a Humanely Raised and Handled product, perceived by a reasonable number of consumers, is that a product is produced and handled in such manner that it upholds a reasonable degree of virtuous principle, as it relates to the welfare of the animal subject to the reference, if the label implies such notion.

12. For instance, the American Humane Association conducted a survey with 2,634 consumers and found that: (1) 95.21% of the consumers believe a product that is labeled humanely raised referred to the "better treatment of animals;" (2) 74% of the consumers would be "very willing" to pay an increased amount for such products; (3) of that 74%, 34% were willing to pay 10-20% more; and (4) 28% would be willing to pay 20-30% more for humanely raised products.[1]

13. In 2014, a survey by the American Humane Association of more than 5,900 consumers found that: (1) 92.6% of the participants felt that it was "very important" to buy

---

[1]  *See* https://www.americanhumane.org/app/uploads/2013/08/humane-heartland-farm-animals-survey-results.pdf (last accessed 6/13/19).

supporting the humane treatment of farm animals; and (3) only 0.7% were either not interested or felt that the humane treatment of farm animals did not concern them.[2]

14. According to the 2018 Power of Meat Survey: (1) humanely-raised products significantly influence consumers to purchase their product, as opposed to conventional products that do not have such claims; (2) more than 65% of consumers aware of the humanely raised claim on a product were reported to feel more inclined to purchase that product over a conventional product and (3) 71% of Millennials and 64% of boomers claimed that they would likely select a humanely raised product over a conventional product.[3]

## II. The Humane Treatment of Cows Is the Basis for Fairlife Milk's Premium Price.

15. Defendants exploited consumer desire for dairy products originating from farms that ensure increased levels of animal well-being by making their representations a central premise in their labeling strategy. Defendants executed these actions while methodically mistreating their cows.

16. Defendants' representations are effectively uniform on every label of their milk products.

---

[2] *See* https://www.americanhumane.org/app/uploads/2016/08/2014-humane-heartland-farm-survey.pdf (last accessed 6/13/19).

[3] *See* http://www.meatconference.com/sites/default/files/books/Power_of_meat_2018.pdf (last accessed 6/13/19).

the one directly below:



18. The label specifically states:

**OUR PROMISE**

We are dairy farmers who **believe in better.**® From our farm in Fair Oaks, Indiana, along with all of our family farm partners, we started **fairlife**® to provide high quality real milk filtered for wholesome nutrition from farms where we take exceptional care at every step.

- **Extraordinary care for our cows**
- **High milk quality standards**
- **Traceability back to our own farms**
- **Pursuit of sustainable farming**

*Mike & Sue McCloskey*

**fairlife**® co-founders, dairy farmers (emphasis in original)

19. Likewise, the following label of the milk product is fundamentally identical to the one displayed directly below:



20. The label specifically states:

**OUR PROMISE**

We provide extraordinary animal care, and we can trace our milk back to the family farms that produced it, so you can confidently enjoy every sip.

*Mike & Sue McCloskey*
**fairlife**® co-founders, dairy farmers (emphasis in original)

21. Directly below the co-founders' signature is an illustration of the "flagship farm in Indiana" where the matter of animal maltreatment occurred.

22. A further example of a 1.5 liter label of the milk product is displayed directly below. The version directly below illustrates the uniform promise that is made on Defendants'

make the same fundamental claims as depicted below:



23. The label specifically states:

**OUR PROMISE**

The idea for this one-of-a-kind milk began at our kitchen table over 20 years ago. It was an ambition to provide the world with better nutrition while making the world a better place. Our **fairlife**® family farmers provide high quality, real milk, filtered for wholesome nutrition with exceptional care taken every step of the way.

- **Extraordinary care and comfort for our cows**
- **Exceptional quality milk standards**
- **Traceability back to our farms**
- **Continual pursuit of sustainable farming**

We'd love to have you visit our flagship farm in Indiana so you can see for yourself.

*Mike & Sue McCloskey*
**fairlife**® co-founders, dairy farmers

24. Directly above the co-founders' signature is an invitation to visit their "flagship farm in Indiana" where the animal mistreatment occurred.

Indiana" where the animal mistreatment occurred.

26. Defendants make an explicit "promise," in large bold lettering on all material labels of the milk products, that they provide "extraordinary animal care" (on the 11.5 once labels) or "extraordinary care and comfort for our cows" (on the 1.5 Liter labels). The "promise" is signed on the milk products' labels by Defendants Mike McCloskey and Sue McCloskey. However, as discussed herein, Defendants' "promise" is a sham. Defendants' calves and cows do not receive "extraordinary care," but are instead methodically abused and ill-treated while they are present at the "flagship farm in Indiana".

**III. Defendants' Representations Are False.**

27. Between August and November 2018, an undercover investigator from the Animal Recovery Mission ("ARM"), a nonprofit animal welfare organization founded in 2010, disguised himself as a calf care employee at Fair Oaks Farms. Fundamentally, the actions on behalf of the investigator are warranted due to the explicit invitation located on the labeling of their products, as referenced above.

28. During that time, while undercover, the investigator documented several instances that illustrate the methodical and monstrous ill-treatment of the Defendants' cows that took place at Fair Oaks Farms. Such documents can be located at https://vimeo.com/340769169 (one-and-a-half-hour video) (last accessed 6/13/19) and https://vimeo.com/341672220 (4-minute video) (last accessed 6/13/19).

29. While undercover, the investigator documented (and recorded) observing the following examples of maltreatment "on virtually a daily basis" which were "a matter of routine and practice" at Fair Oaks Farms:

- Calves thrown off the side of trucks;

- Calves stabbed and beaten with steel rebar;

- Calves through the dirt by their ears;

- Calves hit in the mouth and face with hard plastic milking bottles;

- Calves kneed in the spine;

- Calves left to die in over 100-degree temperatures;

- Calves provided with improper nutrition;

- Calves denied medical attention;

- Calves experiencing extreme pain and suffering, and in some cases permanent injury and death; and

- Calves that do not survive the torture are dumped in mass graves.

30. The investigator noted that "the abuse is rampant" at the Fair Oaks Farm in Indiana, which customers of the Fairlife product are encouraged to visit, as described above.

31. The following images are an accurate representation of the "care" that Defendants' cows receive:

<u>Dumping Area for Dead Calves</u>





Calf's Head Being Stomped By Full Weight of Adult Man



Calves Left Throughout Summer in 113 Degree Temperature



Calf Being Choked and Thrown into a Trailer



**IV. Defendants Admit that the Animal Abuse Took Place at Fair Oaks Farm.**

32. Soon after the release of the video, defendant Mike McCloskey admitted that everything depicted in the video occurred at Fair Oaks Farm in Indiana.

33. Defendant Mike McCloskey admitted that "after closely reviewing the released ARM video," he can confirm that employees at Fair Oaks Farm – the "flagship farm" – were "committing multiple instances of animal cruelty and despicable judgment." Defendant Mike McCloskey stated that he "take[s] full responsibility for the actions seen in the footage, as it goes against everything that we stand for in regard to responsible cow care and comfort."[4] (emphasis added). In other words, while the labels of Defendants' milk products promised "Extraordinary care and comfort for our cows," defendant Mike McCloskey admits that Defendants have failed to live up to that standard by "committing multiple instances of animal cruelty and despicable judgment." Nonetheless, although defendant Mike McCloskey stated he took "full responsibility," he then went on to excuse the animal abuse by blaming a few bad apples, even though the abuse was rampant and known and approved by management at Fair Oaks farms.

---

[4] *See* https://fofarms.com/post/response/ (last accessed 6/14/19).

a public statement on behalf of Fairlife:

> This week we saw appalling footage of animal abuse at Fair Oaks Farms, one of Fairlife's supplying dairy farms. This was something that never should have happened. It was wrong. Animal care is foundational to Fairlife. We have a responsibility to make sure that the dairy farms that supply our milk uphold the highest and most humane standards. We failed in doing that, and we are truly sorry. But sorry is not good enough, we offer you a commitment to improving practices that we now know were insufficient.[5]

35. Mr. Doelman also admitted in the video that Fairlife conducted only one purportedly unannounced audit per year of its dairy farms.

## V. Defendants Profited from Their Fraudulent Marketing Scheme.

36. As exemplified herein, a clear majority of consumers prefer products that ensure the general well-being of animals that produce such products is a top priority. Therefore, the fraudulent claims displayed on Defendants' product labels are an attempt to elevate product demand, and ultimately accumulate a significant increase in product revenue.

37. In September of 2017, according to Food Navigator-USA, it discovered that: (1) In 2016, Defendants increased their revenue in dollar sales by 79%, according to the Fairlife VP of Communications Anders Porter, and (2) that Fairlife had an estimate 76,000 outlets nationwide.[6]

---

[5] *See* https://fairlife.com/news/fairlife-statement-regarding-arm-video/ (last accessed on 6/14/19).

[6] *See* https://www.foodnavigator-usa.com/Article/2017/09/12/fairlife-ultra-filtered-milk-sales-surged-79-in-2016 (last accessed 6/14/19).

sales in 2015; (2) $350.0 million in sales in 2017; and (3) the Fair Oaks Farms was listed as one of the plants contributing to the production of Fairlife products.[7]

39. In more recent article from Food Navigator-USA in 2019, it was reported that Fairlife is increasing its "production and distribution" by planning to construct a new $200 million production facility, which is estimated to produce 3 to 4 million pounds of milk each day, and Fairlife sales have increased by 42% compared to the previous year.[8]

40. All material increases in revenue and product demand, as allocated above, are a product of deceptive marketing. Thus, consumers who purchased Defendants' products did so based on a fallacy that Defendants claims regarding animal welfare were veracious.

## Class Allegations

41. Plaintiff Chelsea Abowd brings this action on behalf of herself and all Indiana residents who purchased Defendants' milk products on or after September 24, 2017 (the "Class Period") in the State of Indiana, each such person termed as "Class Member," and all such persons termed the "Class."

42. Plaintiffs seeks certification under Fed. R. of Civ. Pro. 23(b)(2) and (3).

43. Excluded from the Indiana Class are: (a) Fairlife and its employees, principals, affiliated entities, legal representatives, successors and assigns; (b) the judges to whom this action is assigned and any members of their immediate families; and (c) all governmental entities.

---

[7] *See* https://www.dairyfoods.com/2017-Dairy-100-3 (last accessed 6/14/19).
[8] *See* https://www.foodnavigator-usa.com/Article/2019/04/09/fairlife-to-build-200m-production-facility-to-meet-consumer-demand (last accessed 6/14/19).

geographically dispersed throughout Indiana. Therefore, individual joinder of all Indiana Class Members would be impracticable.

45. Common questions of law or fact exist as to all Indiana Class Members. These questions predominate over the questions affective only individual Indiana Class Members. These common legal or factual questions include:

    a.   Whether Fairlife provided "extraordinary" care for animals, including the calves and dairy cows that produced the milk products;

    b.   Whether Fairlife's "promise" that they provide "extraordinary animal care…so you can confidently enjoy every sip" on the milk products is likely to deceive a reasonable consumer;

    c.   Whether Defendants' representations are unlawful;

    d.   Whether an injunction against Defendants is warranted; and

    e.   The appropriate measure of damages, disgorgement, and restitution.

46. Plaintiffs' claims are typical of the claims of the Indiana Class in that Plaintiffs are consumers who purchased Defendants' milk products in Indiana during the Indiana Class Period. Plaintiffs are thus no different in any relevant respect from any other Indiana Class Member, and the relief sought is common to the Indiana Class.

47. Plaintiffs are adequate representatives of the Indiana Class because their interests do not conflict with the interests of the Indiana Class Members they seek to represent, and they have retained counsel competent and experienced in conducting complex class action litigation. Plaintiffs and their counsel will adequately protect the interests of the Indiana Class.

adjudication of this dispute. The damages suffered by each individual Indiana Class Member will be relatively small, especially given the relatively low cost of the milk products at issue compared to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' conduct. Thus, it would be virtually impossible for Indiana Class Members individually to effectively redress the wrongs done to them. Moreover, even if the Indiana Class Members could afford individual actions, which they cannot, it would still be far less desirable than efficient class-wide litigation. Individualized actions present the potential for inconsistent or contradictory judgments. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

49. In addition, the Indiana Class may be certified because Defendants have acted or refused to act on grounds generally applicable to the Indiana Class, thereby making appropriate declaratory and equitable relief with respect to the Indiana Class.

**COUNT I: Indiana Deceptive Consumer Sales Act I.C. § 24-5-0.5**

50. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

51. Defendants engaged in a consumer transaction with Plaintiff and Class Members pursuant to Ind. Code § 24-5-0.5-2.

52. Defendants are suppliers as defined under Ind. Code § 24-5-0.5-2.

53. Defendants violated Ind. Code § 24-5-0.5-3(a) by engaging in an unfair, abusive, and/or deceptive act of claiming that: Fairlife provides "extraordinary animal care;" "exceptional care [is] taken every step of the way…;" and its cows receive "extraordinary

representations were false.

54. Defendants violated Ind. Code § 24-5-0.5-3(b)(1) by making oral, written, and/or electronic representations that the milk products had characteristics and/or benefits it did not have and which the Defendants knew or should have reasonably known that it did not have. More specifically, Defendants claimed that: Fairlife provides "extraordinary animal care;" "exceptional care [is] taken every step of the way…;" and its cows receive "extraordinary care and comfort. Defendants knew or should have reasonably knowns that said representations were false.

55. Defendants violated Ind. Code § 24-5-0.5-3(b)(1) by making oral, written or electronic representations that the milk products were of a particular standard, quality, grade, style, or model, even though said representations were false and the Defendants knew or should reasonably have known that they were false. More specifically, Defendants claimed that: Fairlife provides "extraordinary animal care;" "exceptional care [is] taken every step of the way…;" and its cows receive "extraordinary care and comfort. Defendants knew or should have reasonably knowns that said representations were false.

56. Defendants' conduct was willful or in reckless disregard of Plaintiff and Class Members' rights under the Indiana Deceptive Consumer Sales Act.

57. Defendants' conduct proximately caused injuries to Plaintiff and Class Members.

58. Plaintiff and Class Members reasonably relied on upon Defendants' misrepresentations.

59. Defendants' deceptive acts were done as part of a scheme, artifice, or device with intent to defraud or mislead and constitute incurable deceptive acts under Ind. Code § 24-

60. Plaintiff and Class Members are entitled to statutory damages, reasonable attorney fees, costs of suit, treble damages and an order enjoining Defendants' unlawful practices, and any other relief which the Court deems proper.

### COUNT II: Unjust Enrichment

61. Plaintiffs reallege and incorporate the foregoing paragraphs as though fully reproduced herein.

62. Plaintiffs and Class Members conferred a monetary benefit upon Defendants in the form of monies paid for the purchase of Fairlife's ultra-filtered milk products. Plaintiffs and the Indiana Class Members also paid premium prices for Fairlife's ultra-filtered milk products where said premium prices were partially or wholly justified by the representation that the milk was obtained from dairy cows that received "extraordinary care and comfort".

63. Defendants misrepresented that its cows received "extraordinary care and comfort".

64. Defendants benefitted from its misrepresentations because: (1) Plaintiff Class Members purchased the Fairlife utra filtered milk products relying upon Fairlife's misrepresentations; or (2) Plaintiff and Class Members paid an additional premium for Fairlife ultra filtered milk products which were produced by dairy cows that received "extraordinary care and comfort".

65. Under principals of equity and general morality, Defendants should not be permitted to retain proceeds resulting from its unjust and deceptive conduct including but not limited to additional premium charged and paid for by the Plaintiff and Class Members for milk produced from cows which received "extraordinary care and comfort".

66. Defendants' enrichment at the expense of the Plaintiffs and Class members is unjust.

67. As a result of Defendants' wrongful conduct, as alleged above, Plaintiffs and Indiana, California, Virginia, Michigan, and Kentucky Class Members are entitled to restitution, disgorgement of profits, benefits, and other compensation obtained by Defendants and all other

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and on behalf of the Indiana Class, and for the claims brought on behalf of the general public, request an award and relief as follows:

A.  An order certifying that this action is properly brought and may be maintained as a class action and appointing Plaintiffs Abowd and as Class Representative for the Indiana Class and Plaintiffs' Counsel as Counsel for the Class.

B.  Statutory damages and treble damages for the Indiana Class under the Indiana Deceptive Consumer Sales Act.

C.  Restitution in such amounts that Plaintiffs and all Indiana or paid as a premium over alternatives, or restitutionary disgorgement of the profits Defendants obtained from those transactions, for claims for which they are available.

D.  Compensatory damages for claims for which they are available.

E.  Punitive damages for claims for which they are available.

F.  A declaration and order enjoining Defendants from advertising its products misleadingly, in violation of Indiana Deceptive Consumer Sales Act, and other applicable laws and regulations as specified in this Complaint.

G.  An order awarding Plaintiffs their costs of suit, including reasonable attorneys' fees and pre- and post-judgment interest.

H.  An order requiring an accounting for, and imposition of, a constructive trust on all monies received by Defendants as a result of the unfair, misleading, fraudulent, and unlawful conduct.

I.  Such other and further relief as may be deemed necessary or appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff and the other Class members respectfully request that the Court:

A.      Certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Award damages, including compensatory, exemplary, statutory, incidental, consequential, actual, and punitive damages to Plaintiff and the Class in an amount to be determined at trial;

C.      Award Plaintiff and the Class their expenses and costs of the suit, pre-judgment
        interest, post-judgment interest, and reasonable attorneys' fees;

D.      Grant restitution to Plaintiff and the Class and require Defendants to disgorge
        their ill-gotten gains;

E.      Permanently enjoin Defendants from engaging in the unlawful conduct set
        forth  herein; and

F.      Grant any and all such other relief as the Court deems appropriate.


Dated: September 24, 2019                              Respectfully submitted,


                                                _/s/ Ryan R. Frasher_____
                                                Ryan R. Frasher No.  27108-49
                                                3209 W. Smith Valley Road, Suite 253
                                                Greenwood, IN 46142
                                                T: 317.300.8844
                                                F: 317.218.4501
                                                rfrasher@frasherlaw.com

                                                Attorney for Plaintiff and Proposed Class